UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| Kylee Aitken,<br><br>           Plaintiff,<br><br>v.<br><br>Wilderness Training & Consulting, LLC d/b/a Family Help & Wellness, Trails Carolina, LLC,<br><br>           Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

## INTRODUCTION

1. As a 12-year-old little girl, Plaintiff ("**Kylee**") was sexually abused by "**Will**," who was an employee or agent of Trails Carolina, LLC, and Wilderness Training & Consulting, LLC ("**WTC**", and with Trails Carolina, LLC, "**FH&W**") at all times relevant to this Complaint.

2. To punish Kylee for attempting to escape FH&W's "wilderness therapy" program formerly located in Lake Toxaway, North Carolina ("**Trails Carolina**"), FH&W required Will – an adult, male "field instructor" with no professional license or clinical training – to provide constant, one-on-one supervision of Kylee. At night, FH&W required Will to "burrito" wrap Kylee in a tarp and sleep against her body. While on FH&W's "assigned proximity," Will accompanied Kylee alone when she was required to relieve herself in the woods; on at least six of these occasions, Will sexually abused Kylee.

3. When Kylee was finally free of Will, she reported Will's misconduct to FH&W. Instead of complying with North Carolina's mandatory reporting laws and intervening to aid Kylee by obtaining appropriate intervention, FH&W kept Kylee's sexual abuse a secret, gaslit Kylee to silence her complaints, kept custody over her, and required her to have further personal interactions with Will. FH&W condoned this tortious conduct and profited from it by adopting and enforcing company policies that conflict with the mandatory reporting laws and retaining Kylee for months.

## THE FAMILY HELP & WELLNESS BUSINESS ENTERPRISE

4. WTC is an active limited liability company formed and existing under the laws of the State of Oregon that maintains its principal office in Salem, Oregon, and conducts its business under the trade name "Family Help & Wellness." WTC is not a hospital, nursing home, or adult care home.

5. WTC is the sole owner and sole manager of Trails Carolina, LLC, which is an active, member-managed limited liability company formed and existing under the laws of the North Carolina. Trails Carolina is not a hospital, nursing home, or adult care home.

6. WTC used Trails Carolina, LLC, to operate its "Trails Carolina" program in North Carolina until NC DHHS permanently revoked its license to operate in 2024 following the death of Clark Harmon, a 12-year-old boy in FH&W's care at the program, whose death was found to be a homicide by the medical examiner.

7. As Trails Carolina, LLC's manager, WTC controls its operations. WTC's officers are, upon information and belief, Trails Carolina, LLC's officers; and these officers' acts and omissions made in connection with the operations of FH&W's "wilderness therapy" program, Trails Carolina, were made in furtherance of FH&W's business enterprise.

8. Additionally, upon information and belief, WTC either employed or co-employed Trails Carolina, LLC's employees, and WTC enrolled qualified employees who worked at the Trails Carolina program in WTC's employee benefit programs.

9. WTC has highly fragmented its Family Help & Wellness enterprise. According to WTC:

> Family Help & Wellness was founded with the modest goal of opening a single, superior wilderness therapy program offering cutting-edge care based on the work of experts in the field. After seeing stellar initial results, it was apparent we could help many more youth and families by expanding our efforts with other leaders in

the field. Since then, we've assembled an unparalleled team of behavioral health experts to develop a variety of innovative new programs that are producing sustainable change in even the most difficult cases.

\*\*\*

We offer a variety of immersive, clinically sophisticated, and outcome-driven programs including wilderness therapy, boarding school environments, assessment facilities, psychiatric hospitals, and transitional housing. All of these settings create a warm, caring environment in which your child can face challenges and receive real-time counseling and intensive therapy. After your child goes through one of our programs, they will have developed the skills necessary to lead a happier, healthier life.

\*\*\*

Family Help & Wellness is the leading provider of private pay behavioral health for adolescents and young adults. Since 2008, we've helped over 12,000 families and now offer 15 programs with over 1.5M+ client days under our belt.[1]

10. In addition to Trails Carolina, LLC, WTC is the sole owner and managing member of the licensed operating entity for blueFire Wilderness, another Family Help & Wellness outdoor therapy program located in Challis, Idaho. Through blueFire Wilderness, WTC takes custody of and provides a "wilderness therapy" program to children as young as 11 years old in its outdoor therapy program.

11. Likewise, WTC is the sole owner and managing member of the licensed operating entity for Momentum Young Adult (formerly known as "Trails Momentum"), an outdoor therapy program in Hendersonville, North Carolina, for young adults aged 18 to 25.

12. Similarly, WTC is the sole owner and managing member of the licensed operating entity for Foundations Asheville, a residential community in Asheville, North Carolina for young adults aged 18 to 25.

13. Furthermore, WTC is the sole owner and managing member of the licensed

---

[1] https://famhelp.com/about-us/

operating entity the following nine (9) Family Help & Wellness residential treatment programs that operate in either North Carolina, Utah, or New Mexico:

    a) Asheville Academy, a therapeutic boarding school in Black Mountain, North Carolina, that admits children as young as 10 years old;

    b) Magnolia Mill School, a self-described learning community in Weaverville, North Carolina, that admits children as young as 14 years old;

    c) Sandhill Center, a residential treatment program in Los Lunas, New Mexico, that admits children as young as 8 years old;

    d) Elevations Residential Treatment and Educational Center, a residential treatment program in Syracuse, Utah that admits children as young as 13 years old;

    e) Discover Seven Stars, a residential treatment program within the Elevations Residential Treatment and Educational Center in Syracuse, Utah, that admits children as young as 13 years old;

    f) New Focus Academy, a residential treatment program in Heber City, Utah, that admits children as young as 12 years old;

    g) ROOTs transition, a self-described hybrid model of outdoor reflection and residential integration located in Park City, Utah, that admits children as young as 15 years old;

    h) Solstice West, a residential treatment center in Layton, Utah, that admits children as young as 14 years old; and

    i) Uinta Academy, a residential treatment center in Wellsville, Utah, that admits children as young as 12 years old.

14. Trails Carolina, LLC, has no independent corporate identity from WTC; it is merely

an alter ego and mere instrumentality that WTC used to operate one of WTC's "wilderness therapy" programs in North Carolina until NC DHHS permanently revoked the license to operate in 2024. Until WTC modified its website in 2024 following the license revocation, WTC advertised Trails Carolina as one of Family Help & Wellness' "outdoor therapy" programs.[2]

15. Since June 20, 2008, FH&W's written policy and practice has been to accept custody of children as young as 10 years old into its "Trails Carolina" program. As described herein below, WTC operated Trails Carolina, LLC, in a matter that violated statutory and other legal duties that FH&W owed to the children in its custody and care, including Kylee.

16. In 2015, FH&W claimed that its "**Trailblazers**" program at Trails Carolina for young girls like Kylee was a "single gender" program that kept "girls and boys separate" for their safety, protection, and to address "specific gender needs of this age group":

> Trailblazers is the only single gender program in the U.S. for students' ages 10-13 years. It is specifically tailored to meet the demanding developmental needs of Pre-Teens in a safe wilderness camp environment filled with the strong routines, structure, and concrete experiences children this age need. However, the Trails Team provides this population more "hand-holding" and extra support to ensure the students feel safe and protected. For social reasons and brain development stages, we separate girls and boys and provide a therapeutic approach that addresses the specific gender needs of this age group.
>
> ***
>
> In the wilderness, girls don't have access to technology, mirrors and makeup, which frees their minds from distractions and lets them be vulnerable and live in the moment. This is an ideal time for our team of field instructors and therapist to engage in more insight oriented conversations that help these girls build courage to be their own self.[3]

17. Despite creating and marketing the façade of a safe and therapeutic program for pre-teen girls, FH&W isolated these little girls in the wilderness with unlicensed, untrained, and

---

[2] https://famhelp.com/programs/#outdoor
[3] Quoted from the website formerly located at http://trailscarolina.com/trails-north-carolina/programs-for-troubled-teens.

unknown "field instructors" - including adult men like Will - without employing adequate hiring practices, training, supervision or providing these little girls with adequate means of communication, medical care, food, or shelter despite the foreseeable that harm could result from FH&W's negligent policies and practices.

18. Likewise, despite knowing that North Carolina is a universal mandatory reporting state of juvenile abuse or neglect,[4] FH&W repeatedly failed to report abuse and neglect to authorities and fails to take prompt action to protect the children in its custody and care.

19. Moreover, FH&W utilized policies and procedures with its staff that contradicted North Carolina's mandatory reporting law and prevented appropriate regulatory and law enforcement oversight and intervention for the protection of the minors in their custody.

20. As discussed further herein, FH&W, by its corporate policies and practices, acts, failures, condonations, and omissions, were directly responsible for and profited from a negligent program and environment that enabled Kylee's sexual abuse and neglect, as well as the sexual abuse and neglect of other children.

21. As a proximate result of FH&W's operations, Kylee has suffered severe and life-long injuries from the sexual abuse, neglect, and trauma she suffered while she was in the actual and legal care and custody of FH&W.

## JURISDICTION AND VENUE

22. Upon information and believe, WTCSL, LLC, an Oregon limited liability company, is the sole member and manager of WTC.

23. WTCSL, LLC's membership is a diverse number of individuals invested in the wilderness therapy industry in locations where WTC conducts Family Help & Wellness

---

[4] N.C.G.S. G.S. 7B-301

operations. Specifically, upon information and belief, WTCSL, LLC's members are:

a) WTC Holdco, LLC, upon information and belief, are:

- FHW/THP Blocker, Inc., a private equity firm formed in and maintaining its principal place of business in Texas and that does business under the trade name Trinity Hunt Partners;

- PGO, LLC, whose member is Sue Crowell, a citizen of North Carolina;

- Opal Creek Capital, LLC, whose member is Tim Dupell, a citizen of Oregon;

- JLC Family, LLC, whose member is Johnny Deblock, a citizen of Washington; and

- Wayne Laird, who is a citizen of Oregon and who is the Chief Financial Officer of Family Help and Wellness and its subsidiaries, including Trails Carolina, LLC;

b) Graham Shannonhouse, a citizen of North Carolina;

c) Kathryn Huffman, a citizen of North Carolina;

d) Cat Jennings, a citizen of North Carolina;

e) Dilly Bean LLC, whose sole member is Bryan Tomes, a citizen of North Carolina;

f) John Gordon, a citizen of North Carolina;

g) Mary S. Pierce, a citizen of North Carolina;

h) Rebecca Gebb, a citizen of North Carolina;

i) SEJC Holdings, LLC, whose sole member is Kyle Gillett, a citizen of North Carolina;

j) FNS Group, LLC, whose sole member is Dan Stuart, a citizen of Utah;

k) Ikaika Holdings LLC, whose sole member is Keoni Anderson, a citizen of Utah;

l) Randi Nelson, a citizen of Utah;

m) Jen Wilde Consulting PLLC, whose sole member is Jennifer Wilde, a citizen of Utah;

n) Laura Burt, a citizen of Utah;

o) Mahalo Nui, LLC, who sole member is Judith Jacques, a citizen of Utah;

p) Scott Hess, a citizen of Utah;

q) Shayne Gallagher, a citizen of Utah;

r) Sheri Gallagher, a citizen of Utah;

s) Jesse Long, a citizen of Oregon;

t) Hayden Dupell, who is a citizen of Oregon and who is the Chief Operating Officer of Family Help and Wellness and its subsidiaries, including Trails Carolina, LLC;

u) Kirsten Morgan, a citizen of Oregon;

v) Matt Roy, a citizen of Oregon;

w) Steven Stradley, a citizen of Oregon;

x) Jon Worbets, a citizen of Idaho;

y) Kathy Rex, a citizen of Idaho;

z) Reid Treadaway, a citizen of Idaho;

aa) Simpson Holdings, L.C., whose two members are Jeff Simpson and Becky Simpson, who are citizens of Arizona; and

bb) White Mountain Consulting LLC, whose sole member is Josh White, a citizen of Arizona.

24. Therefore, for the purposes of diversity jurisdiction, both WTC and Trails Carolina, LLC are citizens of North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington.

25. Kylee is a citizen of California.

26. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Kylee and the Defendants, and the amount in controversy in this case exceeds $75,000.00 exclusive of costs and interest.

27. Venue is proper in the Asheville Division of the United States District Court for the Western District of North Carolina because the most substantial part of the events and omissions giving rise to Kylee's claims occurred in Transylvania County.

## COMMON FACTUAL ALLEGATIONS

28. FH&W is in the business of profiting off the provision of various programs to "troubled" children, and it promises parents that these programs will cause these children to "develop skills necessary to lead a happier, healthier life." Trails Carolina was one such program.

29. Since 2010, the State of North Carolina has invested significant public resources in its effort to investigate and correct FH&W's abuse and neglect of the children in its custody and care at FH&W's Trails Carolina program.

30. On March 4, 2010, NC DHHS cited Trails Carolina for violating North Carolina law and failing to ensure numerous allegations of abuse were reported, highlight to FH&W that its Trails Carolina program was insufficient to avoid and address the harm, abuse, and neglect of children.

31. On March 23, 2010, NC DHHS wrote Graham Shannonhouse ("**Shannonhouse**"), who was then the Executive Director of the Trails Carolina program and one of the ultimate owners of FH&W, that NC DHHS required a Plan of Correction from FH&W regarding its violation of 10A NCAC 27D .0304 and its harm, abuse, and neglect of a child in its Trails Carolina program.

32. On April 6, 2010, FH&W assured NC DHHS that its staff had received training in

response, that it had formed a Quality Assurance Committee, and that all allegations of abuse would be reported to the appropriate channels in the future. However, this was mere window dressing by FH&W.

33. In February 2014, CARF International ("**CARF**"), one of the accrediting organizations for FH&W's program at Trails Carolina, performed a three-year accreditation survey of the program and provided its written findings and recommendations to Shannonhouse. CARF instructed Shannonhouse that the Trails Carolina program needed to seek improvement in many ways to conform to professional standards, including the following that are relevant to Kylee's claims:

   a) FH&W needed to conduct an annual review of the program's policies;

   b) FH&W needed to implement a cultural competency and diversity plan that addresses the children served by the Trails Carolina program, based on considerations that include a child's age and gender, and that FH&W needed to include this plan in all of the activities at the Trails Carolina program;

   c) FH&W needed to consistently implement written procedures for the supervision of direct service staff, for providing feedback to enhance their skills, and to deal with their with unplanned absences to ensure continuity of direct supports to the children.

   d) FH&W needed to document its ongoing supervision of direct service staff to address accuracy of assessment skills, proficiency of referral skills, and appropriateness of services or supports selected relative to the specific needs of the children served, service effectiveness.

   e) FH&W needed to show documentation that its ongoing supervision of direct service

staff addressed ethics, legal requirements, and boundaries with these individuals.

 f) FH&W needed to provide documentation of any service documentation issues identified through ongoing compliance review, cultural competency issues, and model fidelity when implementing evidence-based practices;

 g) FH&W needed to adopt a procedure to consistently evaluate methods to reinstate restricted or lost rights of children served, the privileges of the children served, and the purpose or benefit of any type of restriction on rights or privileges.

 h) FH&W needed to provide an orientation to each child serve that included an explanation of how the child might retain rights or privileges that become restricted;

 i) FH&W needed to document how the results obtained from the primary assessment of the child are used in the development of the individualized plan for that child;

 j) FH&W needed to consistently address in its quarterly records review the appropriateness of services, patterns of service utilization, and model fidelity; and

 k) FH&W needed to consistently perform a quarterly review on a representative sample of closed records.

34. Additionally, CARF consulted and advised FH&W in February 2014 that:

 a) it should simplify its various handbooks and other sources of program documentation into a single written plan to help children and employees clearly understand the delivery of services at Trails Carolina;

 b) its in-house human resource staff needed to become more familiar with human resource management;

 c) it should develop a checklist or some other orderly method to demonstrate that the information collected from its review process is used to improve the quality

> of services, to identify personnel training needs, and is included in FH&W's performance improvement activities; and
>
> d) it should consider how make the children it served more comfortable and provide them a more home-like setting of care.

35. Despite the prior intervention by NC DHHS and the recommendations of CARF, FH&W's Trails Carolina program was again cited by NC DHHS due to its abuse and neglect of Alec Lansing, a minor who died while enrolled at the Trails Carolina program in November 2014.

36. On March 23, 2015, NC DHHS assessed a $12,000.00 administrative penalty against FH&W's Trails Carolina program for the harm, abuse and neglect of Alex Lansing, emphasizing again to FH&W that its Trails Carolina program was insufficient to avoid and address the harm, abuse, and neglect of children.

37. In its Plan of Correction submitted in response to NC DHHS's citation, FH&W assured NC DHHS it had adopted a policy to notify law enforcement officers within two hours of a child going missing. Again, this was more window dressing by FH&W.

38. Subsequently in 2015, Kylee – then a 70 pound, 12 years old little girl – was taken unexpectedly and by force from her home by a transport company who brought her to the State of North Carolina and left her in the custody and care of FH&W's program at Trails Carolina.

39. Upon arrival, Kylee was strip-searched, had her possessions confiscated, and was taken into the wilderness without her personal belongings or any means to communicate directly with her parents. She was united with a group of unknown children, which FH&W assigned the nickname "**Foxtrot**," and a group of adults unknown to her.

40. Terrified, confused, and completely isolated from her parents and the outside world, Kylee attempted to escape FH&W's custody; she ran away from the Foxtrot and into the wilderness.

41. Despite purporting to adopt a policy to report elopements following the death of Alex Lansing, FH&W did not report Kylee's elopement to any appropriate authorities.

42. Instead, once Kylee was tracked down by the field staff, FH&W punished Kylee by placing her on "**assigned proximity**," a restrictive form of one-on-one, arm's length supervision that pursuant to FH&W's policies results in the loss of privileges and rights, such as the right to privacy.

43. Among the field staff that then-executive director Shannonhouse, program director Jeremy Whitworth, and Shane Maxson assigned to supervision the young girls in Foxtrot while the group was lead through the wilderness for over a week at a time was the man called "Will." Per Trails' policy, Kylee was never provided Will's full name.

44. When Kylee was on assigned proximity in the woods with Foxtrot, initially Will was primarily responsible for her one-on-one supervision even though there was at least one female member of the "field staff" assigned to Foxtrot at the same time.

45. Because part of the Trails Carolina program includes requiring 12-year-old young girls to toilet themselves in the woods for over a week at a time, FH&W required an adult to monitor Kylee's efforts to relieve herself in the woods. Since FH&W made Will responsible for enforcing Kylee's "assigned proximity," he accompanied Kylee each time she separated from the other little girls in Foxtrot to relieve herself.

46. Will's deviant and unlawful behavior began with his leering at Kylee's lower private area while her pants down so she could relieve herself. Will refused to look away from her private area even when Kylee asked him to do so, claiming he was required to keep eyes on her at all times under the requirements of FH&W's assigned proximity policy.

47. On at least two occasions, Will became aroused watching Kylee relieved herself, and he rubbed his genitalia through his clothes at Kylee while she tried to relieve herself.

48. After getting away with these lewd acts, Will then began to touch Kylee while her pants were down, rubbing his hand across her genitalia, and penetrating her vaginal opening with his finger.

49. Emboldened by getting away with this heinous act, Will then withdrew his erect penis from his clothes while Kylee tried to relieve herself, grabbed Kylee's hand, and required her to touch and hold his penis on the next two occasions that he watched her relieve herself.

50. On or about the final evening before Will rolled off his initial ~ 8-day shift with Foxtrot during Kylee's admission to FH&W's Trails Carolina program, Will rubbed his penis Kylee's mouth while her pants were down, and he required her to "kiss" his penis for him.

51. Kylee was terrified to report Will's misconduct so long as he was physically present with her, which continued around the clock while he was on his approximately 8-day shift in the wilderness with Kylee and Foxtrot. Even at night, as required by FH&W's "assigned proximity" policy, Will kept Kylee wrapped up in a "burrito" using a tarp, and then he kept his body on top of that tarp and held against Kylee's body so that she would be unable to escape his reach without waking him.

52. When Will finished his 8-day shift with Foxtrot, Kylee felt free enough for the first time to report Will's sexual assaults to another FH&W employee, a social worker named Derry O'Kane ("**O'Kane**").

53. During her conversation with O'Kane, Kylee recounted the foregoing incidents of deviant misconduct and sexual abuse by Will, each of which would constitute a felony under North Carolina law.

54. FH&W mandated that its employees "gather the necessary data and receive supervision from a clinical supervisor and the Executive Director," who was at that time

Shannonhouse. Therefore, adhering to FH&W's policy, O'Kane did not report Kylee's allegations to Transylvania County's Department of Social Services.

55. Instead of reporting Kylee's sexual assaults for investigation to the appropriate authorities or her parents, O'Kane gaslit Kylee. She told Kylee that Will would never do such a thing, that each field staff member is subject to a criminal background check before being hired, and that Kylee must have simply dreamed that Will had done these things to her. O'Kane instructed Kylee not to repeat her statements to other persons, stating that if she did so, it could wrongfully ruin Will's life.

56. As a result of its failure to train its employees and agents, as well as its adoption and enforcement of corporate policies that conflict with North Carolina law, FH&W retained custody over Kylee for months and profited from keeping her in FH&W's custody and isolated from her family.

57. FH&W's failure to report Kylee's abuse to either the appropriate authorities or her parents caused Kylee to continue to suffer throughout her period of admission at Trails Carolina. Even though Kylee was eventually released from "assigned proximity," she was subjected to further exposure to Will when he came back onto shift with Foxtrot later during Kylee's admission. This exposure caused Kylee additional fear and lasting trauma.

### FOR A CAUSE OF ACTION AS TO ALL DEFENDANTS
(Negligence & Gross Negligence)

58. All prior paragraphs are incorporated herein.

59. When FH&W took Kylee into its "Trails Carolina" program, Kylee's parents were required to sign over legal custody, and FH&W assumed all duties *in loco parentis* for Kylee.

60. FH&W owed a duty to:

   a. disclose to the parents of potential students that its policies and practices permitted little girls assigned to a single gender cohort to be left in one-on-one,

unprotected custody of an adult man while toileting in the woods;

b. adequately warn of the risk of child sex abuse in its "wilderness therapy" program prior to taking custody over little girls and taking large sums of money from their parents;

c. adequately train and supervise its employees and agents, including the other "field staff" who were in the field with Kylee and Will, to guard against, identify, and respond to sexual assault and battery of little girls;

d. to protect little girls in their custody from sexual assault and battery by monitoring the premises where it held custody of little girls;

e. to adequately investigate claims of sexual abuse and other neglect by little girls in their custody to avoid further harm; and

f. comply with N.C.G.S. §7B-301 and inform the parents when their little girls make allegations of sexual abuse while in FH&W's care.

61. FH&W breached their duties by, including but not limited to:

a. failing to monitor the premises where they held custody over Kylee and the other little girls in her cohort;

b. failing to provide sufficiently trained staff to adequately monitor the safety of Kylee and the other little girls in her cohort;

c. failing to provide adequate security for Kylee and the other little girls in FH&W's care;

d. failing to follow statutory mandates relating to investigating and reporting sexual assaults, leaving Kylee isolated from intervention by either the State of North Carolina or her parents; and

e. failing to act as a reasonable person would to protect Kylee;

f. failing to take even the slightest degree of care and were grossly negligent in their disregard for the well-being of Kylee while she was entrusted in their care;

g. and in such other ways as will be revealed during discovery in this case.

62. It was reasonably foreseeable to FH&W that, if it let an adult man wrap up a little girl in a tarp and sleep against her night after night, repeatedly take her alone in the woods to expose and toilet herself without adequate monitoring, and otherwise placed a little girl in an isolated, vulnerable position with an adult male without adequate supervision, then little girls like Kylee would suffer sexual abuse and lasting trauma.

63. Likewise, it was reasonably foreseeable to FH&W that refusing to report Kylee's allegations of sexual abuse and neglect to the appropriate authorities, keeping her sexual assaults from being investigated, and keeping Kylee isolated from her family and in FH&W's custody for its own profit would result in further trauma and injury to sexually abused little girls like Kylee.

64. Likewise, it was reasonably foreseeable to FH&W that their inadequate policies and procedures, their lack of supervision and training of employees, their failure to monitor the safety of the premises where they kept custody of Kylee, their failure to respond to the warnings of NC DHHS and CARF, and their failure to systemically address ethics, legal requirements, boundaries, trauma, and compliance with their workforce would result in little girls like Kylee suffering sexual abuse and trauma while in FH&W's custody.

65. FH&W's negligent and grossly negligent actions, inactions, and corporate policies and practices were a proximate cause of Kylee's injuries, causing her to suffer sexual bodily injury, develop lasting childhood-sexual-trauma-related disorder, emotional pain and suffering, and such

other damages as will be demonstrated at trial.

66. As detailed hereinabove and will be demonstrated at trial, the officers or managers of FH&W, including Shannonhouse, participated in and condoned conduct constituting an aggravating factors giving rise to Kylee's claim for punitive damages; and FH&W's corporate acts and policies themselves constitute an aggravating factor giving rise to Kylee's entitlement for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Kylee demands a jury trial and requests the entry of judgment against both Defendants in an amount of actual, general, and consequential damages; punitive damages as may be appropriate; attorneys' fees as permitted under North Carolina law; and such interest, costs, and further relief this Court may deem just and proper.

|  |  |
|---|---|
| | s/Shaun C. Blake |
| | Shaun C. Blake (N.C. Bar #35819) |
| | Jenkins M. Mann, Esq. (*pending pro hac vice*) |
| | Attorneys for Plaintiffs |
| | MANN BLAKE & JACKSON |
| | Mailing: PO Box 11803, Columbia SC (29211) |
| | Tel: (803) 256-1268 |
| | Email: sblake@mannblake.com, |
| | jmann@mannblake.com, & |
| March 21, 2025 | schambers@mannblake.com (paralegal) |